## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## SG LIMITED d/b/a StockGeneration, Defendant,

### and

## SG Perfect Limited, SG Trading Limited, Relief Defendants.

### No. CIV. A. 00–11141–JLT.

United States District Court, D. Massachusetts.

Jan. 25, 2001.

Frank C. Huntington, Celia Moore, U.S. Securities & Exchange Commission, Boston, MA, for Securities and Exchange Commission, Plaintiffs.

Daniel I. Small, Meaghan E. Barrett, Butters, Brazilian & Small, Boston, MA, for SG Limited dba StockGeneration, SG Perfect Limited, Trading Limited, Defendants.

## MEMORANDUM

TAURO, District Judge.

Plaintiff Securities and Exchange Commission ("SEC") brings this action against Defendant SG Limited d/b/a StockGeneration ("SG") and Relief Defendants SG Perfect and SG Trading Limited (collectively "Defendants") for violations of federal securities laws. The SEC alleges that Defendants engaged in the offer and sale of unregistered securities in violation of §§ 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), and violated the anti-fraud provisions in § 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5 thereunder (collectively "Security Acts").

## I. BACKGROUND

SG, located in Roseau on the Carribean island of Dominica, is a corporation organized under the International Business Companies Act of Dominica. Relief Defendants SG Perfect and SG Trading, located in Belize City, Belize, are corporations organized as International Business Companies under the laws of Belize.[1]

SG operated a website under the name "StockGeneration," where visitors could buy "virtual shares" of "virtual companies" on a "virtual stock exchange." Participants could choose among eleven "virtual companies" offering varying degrees of risk, with SG setting all "buy" and "sell" prices. The website promised that the share price in one "privileged company" ("Company 9") would continuously rise, guaranteeing investors a 10% per month return.

The SEC alleges that SG's website was "nothing more than a classic pyramid scheme with high-tech trappings, since the money needed to pay off existing investors is derived from investments by new or existing investors." (Compl. at 2). The SEC further alleges that in April 2000, participants' account balances were reduced to pennies on the dollar, and that the SEC subsequently received complaints from participants in 27 states, including Massachusetts.

Defendants' Motion to Dismiss is pending.

## III. DISCUSSION·

■ In considering Defendants' Motion to Dismiss, this court accepts as true the factual allegations of the Complaint and construes all reasonable inferences in

1. According to Defendants' Memorandum of Law in Support of their Motion to Dismiss the SEC's First Amended Complaint: SG Limited was founded in 1997 and duly organized under the laws of the Commonwealth of Dominica. SG Perfect Ltd. was founded in 1998 and duly incorporated under the laws of the British Virgin Islands. SG Trading Ltd. was founded in 1999 and duly organized under the laws of the country of Belize.

favor of Plaintiff. *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 16 (1st Cir.1998). Furthermore, when a complaint's factual allegations are expressly linked to, and dependant upon, a separate document, that document merges into the pleadings for purposes of analyzing a motion to dismiss. *See id.* Here, Plaintiff referred to Defendants' StockGeneration website in the Complaint, and Defendants attached a printout of the website to their Motion to Dismiss. Because Plaintiff neither challenged the authenticity of the attachment nor moved to strike it from the record, it is properly before the court in deciding Defendants' Motion. *See id.*

Defendants move to dismiss the SEC's Amended Complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. At bottom, Defendants argue that SG did not violate the federal securities laws because it did not offer, purchase or sell securities. If federal law does not apply, this court is without jurisdiction and the case must be dismissed.

■ The threshold issue is whether the website constituted an offer and sale of securities for the purpose of the Securities Act and Exchange Act. SG argues that its website invited players to play a "fantasy stock game" and was not engaged in the offer, purchase or sale of securities as defined by the federal securities laws. The SEC argues that SG's website falls within the definition of an "investment contract" under the federal securities laws.

The Supreme Court established a test for determining whether a transaction is an investment contract under the securities laws:

The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test is satisfied, it is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale of property with or without intrinsic value.

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *Howey* thus established a three-part test for an "investment contract": "(1) an investment of money; (2) in a common enterprise; (3) with profits derived solely from the efforts of others." *Sampson v. Invest America, Inc.*, 754 F.Supp. 928, 932 (D.Mass.1990) (Young, J.).

The *Howey* Court described its test as meeting the "statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that *in our commercial world* fall within the ordinary concept of a security.'" *Howey*, 328 U.S. at 299, 66 S.Ct. 1100 (citing H.R.Rep. No. 85, 73rd cong., 1st Sess., p. 11 (1933) (emphasis added)). Here, however, the disputed website transactions are not part of "our commercial world" and are not within the contemplation of the federal statutes. The *Howey* standards, therefore, do not apply.

■ Although SG clearly intended to persuade website visitors to part with their money, the "virtual shares" do not represent any of the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *id.*, covered by federal securities laws. In determining the meaning and scope of the word "security" in the Act(s), substance must prevail over form, with "economic reality" as a guiding principle. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)).

The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities mar-

ket. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.

*Id.* at 849, 95 S.Ct. 2051.

In considering the SEC's claims, this court "must examine the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties." *United Hous.,* 421 U.S. at 851–52, 95 S.Ct. 2051. The shares at issue in *United Housing* provided purchasers with an ownership position in a housing cooperative. There, "investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments." *Id.* at 853, 95 S.Ct. 2051. The Court distinguished those shares by stating: "What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption . . . ." Id. at 858, 95 S.Ct. 2051.

SG labeled their website as a game from the outset. While it is true that participants in the "virtual exchange" parted with their money in the hope of doubling it through SG's promotion of the website and payments by other participants, such activity does not make the "virtual shares" securities. All transactions were in the context of a game. Although participants were looking for financial gain, no investment vehicle was involved. The scenario more closely resembled gambling than an investment in securities.

SG's website enticed visitors with the lure of easy money. "Would you like your money to double each month? Then Welcome to the Virtual Stock Exchange SG!" (Defs.' Ex. at 1). "It is very easy to play SG!" (Defs.' Ex. at 2). "So hurry up and play!" (Defs.' Ex. at 11). The website invited visitors to read the "rules" before "playing" the "game." "These are the basic rules. After you have read them carefully you are ready to start playing." (Defs.' Ex. at 5). The "Official Rules, Regulations, Terms and Conditions of Stock-Generation" contained twenty-six separate sections. (Defs.' Ex. at 6). Section 1 stated, "StockGeneration" (hereinafter 'the Game') is defined as "the virtual stock exchange Game . . . ." (Defs.' Ex. at 6). Section 18 stated, "Decisions made by the Company in all matters relating to the Game are final, binding and conclusive in all matters." (Defs.' Ex. at 6–7). Section 25.1 stated, "Players should be aware that, since this is a virtual game, some of the information on the site is also of a virtual nature . . . ." (Defs.' Ex. at 7). Section 25.6 stated, "Player's [sic] entering the Web Site is solely for Player's [sic] own personal entertainment . . . ." (Defs.' Ex. at 8). The website instructed visitors, "To register and enter The game, press PLAY button." (Defs.' Ex. at 5). The section entitled "The Level of Risk" informed visitors that "companies 1–8 are in fact an ordinary roulette." (Defs.' Ex. at 13). It is difficult to imagine more clear and forceful language alerting potential participants that they would be playing a game, not making an investment.

In its brief and at oral arguments, the SEC focused the court's attention on the "privileged company," which guaranteed a return of 10% per month. Such promises of riches on a "virtual stock exchange" do

not constitute an offer of investment contracts under federal securities laws.

The SEC argues that Defendants' website is analogous to other pyramid schemes found to involve securities. The cases to which the SEC cites, however, are distinguishable because the respective schemes involved commercial dealings within a business context—not a game. *See SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304 (D.C.Cir.1992) (involving a scheme whereby participants invest in a financial distribution network at various levels); *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476 (9th Cir.1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973) (involving a scheme whereby participants purchase motivation/sales instruction "plans" in order to profit by selling similar "plans" to others); *SEC v. The Better Life Club of Am., Inc.*, 995 F.Supp. 167 (D.D.C. 1998), *aff'd w/o op.*, 203 F.3d 54, 1999 WL 236885 (D.C.Cir.), *cert. denied*, 528 U.S. 867, 120 S.Ct. 165, 145 L.Ed.2d 140 (1999) (involving a scheme whereby participants invested in an "advertising pool" for the promise of doubling their money within two to three months); *SEC v. Bennett*, 889 F.Supp. 804 (E.D.Pa.1995) (involving a scheme promising matching gifts for philanthropic purposes financed by fictitious anonymous benefactors, where participants were told funds were placed at well-known brokerage firm of Prudential Securities, Inc.). Here, there is no business context. What is involved is a clearly marked and defined game. The "virtual shares" are simply not the type of instrument " 'that in our commercial world fall[s] within the ordinary concept of a security.' " *Howey*, 328 U.S. at 299, 66 S.Ct. 1100

(citing H.R.Rep. No. 85, 73rd cong., 1st Sess., p. 11 (1933)).

### III. CONCLUSION

 Defendants' Motion to Dismiss for failure to state a claim is ALLOWED.[2]

AN ORDER WILL ISSUE.

### ORDER

The court hereby orders that Defendants' Motion to Dismiss [30] is ALLOWED.

IT IS SO ORDERED.

---

**2.** Defendants move to dismiss the SEC's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction and for failure to state a claim respectively. But because this court has subject matter jurisdiction to determine whether a federal claim existed, dismissal is premised upon Fed.R.Civ.P. 12(b)(6). *See Estate of Soler v. Rodriguez*, 63 F.3d 45, 47 n. 1 (1st Cir.1995) (citations omitted).